United States District Court

Southern District of New York

-----------------------------------------

United States of America,

              -against-

                                          20 Cr. 93 (LTS)

Michael Ackerman,

                    Defendant.

-----------------------------------------

MICHAEL ACKERMAN'S SENTENCING SUBMISSION

                                        Federal Defenders of New York

                                        Attorney for Michael Ackerman

                                        52 Duane Street - 10th Floor

                                        New York, New York 10007

                                        Tel.: (212) 417-8792

                                        Jonathan Marvinny

                                        *Of Counsel*

To:   Damian Williams, Esq.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn: Jessica Greenwood, Esq.
           Sheb Swett, Esq.
           Assistant United States Attorney

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

**REQUEST TO FILE UNDER SEAL**[1]

February 1, 2022

By ECF

Honorable Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:   United States v. Michael Ackerman, 20 Cr. 93 (LTS)**

Dear Judge Swain:

        This is an exceptional case. Michael Ackerman has pled guilty to participating in a fraud with a particularly high loss amount and, under normal circumstances, would be facing certain imprisonment. But circumstances here are anything but normal, as any sentence of imprisonment would amount to a death sentence. Mike has ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████

        Mike's medical condition is an extraordinary circumstance that means this Court should not imprison him. But even apart from his need for medical treatment, other important sentencing considerations also support a reduced sentence. This is Mike's very first conviction, and his offense was non-violent and committed while he was ██████████████████████ ████████████████████ And, critically, he has accepted full responsibility and is remorseful and deterred. At his September 8, 2021 guilty plea he showed an uncommon level of self-awareness and remorse, telling this Court: "I am deeply sorry for my actions. The bottom

---

[1] We respectfully request to file this sentencing submission under seal because it contains a large amount of sensitive medical information and cannot be readily redacted.

Honorable Laura Taylor Swain                February 1, 2022
United States District Judge                 Page 2 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

line is, I am guilty. I took the low road. My entire life I've always taken the high road. That does
not mean a thing now, but I am guilty of this charge." PSR ¶ 32.

While Mike does not dispute that the Guidelines range is properly calculated in the PSR at
78 to 97 months, PSR ¶ 88, the Guidelines, which under the best of circumstances often fail to
account for the complexities involved in arriving at a just sentence, are particularly deficient
here. The Court should decline to follow them. *See generally* Hon. Jed S. Rakoff, *Why the
Federal Sentencing Guidelines Should be Scrapped*, 2013 WL 8171733 ("[T]he Federal
Sentencing Guidelines should be scrapped in their entirety and replaced with a nonbinding,
nonarithmetic multifactor test."). After carefully considering the equities of Mike's case, the
Probation Office has recommended a non-incarceratory sentence. Probation's reasoning is worth
quoting at length:

> The Probation Office believes that Ackerman's medical condition is a significant
> mitigating factor which warrants a non-custodial sentence. It appears that even a short term
> of imprisonment in a medical center operated by the U.S. Bureau of Prisons could
> potentially be a lethal sentence given the defendant's needs, and it would impose an
> expensive and unnecessary burden on prison officials to take responsibility for his care.
> While we acknowledge that this offense was perpetrated over several years and resulted in
> exorbitant losses, it does not appear that a sentence of imprisonment would serve justice in
> this particular case. Ackerman's personal history and characteristics, marked by extensive
> medical and psychological problems, as well as a significant ██████████████████
> ████████████████████████████████, represent extraordinary and
> extenuating circumstances that should be taken into consideration. We also note that the
> defendant is a first-time offender who appears to have otherwise been a law-abiding and
> contributing member of society, and that he has the benefit of above-average educational
> and vocational skills, as well as strong family ties.

PSR p. 31.

If ever there were a case that called out for mercy at sentencing, this is it. In accord with
Probation's assessment, the Court should decline to imprison Mike.

Honorable Laura Taylor Swain                    February 1, 2022
United States District Judge                      Page 3 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

**Mike's history and characteristics, offense, and medical condition**

*Mike's background and commitment to his loved ones.* Michael Ackerman was born in 1969, in Alliance, Ohio. He and his two brothers had a comfortable childhood there. His father was a nuclear engineer and his mother was a nurse in a hospital maternity ward. Mike graduated high school in 1987. He did well academically and was a member of the wrestling and cross country teams. After high school he moved to New York for college, attending Manhattanville College in Purchase, New York. He graduated in 1991 with a degree in economics and finance.

After college he went straight to work on Wall Street. By 1992 he was a full-time stockbroker with UBS. He made good money and enjoyed the work. Eventually, though, technological advancements rendered his position obsolete. He left UBS in 2014 and spent the next couple of years as a self-employed broker under the aegis of a Netherlands-based bank. In 2017, along with two other individuals, he launched Q3, the cryptocurrency trading fund at issue in the offense in this case (discussed below).

In 1996 Mike married Michelle Roiland. They had three children—Megan, Marissa, and Michael. Megan is an accountant and Marissa and Michael are students. Mike and Michelle would remain married for 20 years until their divorce in 2016. Unfortunately, Mike's ███████ ████████ took its toll on their relationship and eventually caused its demise. Today the children live with Michelle in New York City.

But those who know Mike best describe him as a caring father, son, friend, and husband. He loves his three children dearly, though they live far from his home in Ohio. His parents—his father, Jerry, 86, and his mother, Mary, 85—thankfully live two hours away and visit Mike at his home when they're able. They also speak by phone frequently. Sadly, Mary, who has survived multiple bouts of cancer, is in the early stages of dementia.

In 2019 Mike married Stacey Ackerman, née Lepink. Stacey has a graduate degree in teaching and has worked in the pharmaceutical industry, but for the last several years has been Mike's full-time caretaker. Because she is caring for him full-time, neither one of them has worked for the past several years. They have no income whatsoever, and know they'll soon be forfeiting the home in which they live. All they have left is each other. But their love remains strong—Stacey is Mike's wife, friend, and rock.

Somehow, through all his travails, Mike has maintained his humanity. Though he struggles with ████████, on his good days he is gregarious, funny, and kind. This is perhaps unsurprising

Honorable Laura Taylor Swain                        February 1, 2022
United States District Judge                        Page 4 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

to those that know him best—he has a rich history of providing love and support to his family
and friends. His ██████ ████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

████████████████████████████████

Mike's brother echoes the view of him as someone who looks out for others, even if
sometimes to his own detriment:

> Mike is more of a people pleaser than most people I've known. When we were kids and
> our parents fought, Mike was the conciliatory one, the one who wanted problems to go
> away and for everyone to just get along. When Mike had something, he shared, generous
> to a fault. He has always been, from childhood to old age, someone motivated to help the
> people around him.

Letter of Joseph Ackerman (Ex. B).

*Mike's offense.* In 2017, Mike and two partners established Q3 as a vehicle for trading in
Bitcoin and other cryptocurrencies. Mike's role was to develop and implement Q3's trading
strategy, one he would base on strategies he had seen succeed in the similarly decentralized
foreign exchange market. One of Mike's partners took the lead on soliciting investors, who were
mainly wealthy individuals with whom that partner had prior contact.

Mike had control over Q3's primary trading account, which was housed on a well-known
cryptocurrency exchange. He began with good intentions, but quickly saw that he wasn't
achieving the kinds of returns that he had anticipated and that Q3 had promised its investors. He
began to feel keen financial pressure and would go on to make a series of misrepresentations
about Q3's trading account balances to his partners, including through falsified screenshots of
account balances, reporting grossly exaggerated earnings. This misinformation was then passed

Honorable Laura Taylor Swain                    February 1, 2022
United States District Judge                    Page 5 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

on—by both Mike and his partners—to current and prospective investors, who were falsely led
to believe that Q3 was earning far more than it was.

By the time of its demise in 2019, Q3 had received over $30M from its clients, but had
only invested around $10M into cryptocurrency exchanges. *See* Pl's Mem. in Supp. of Mot. for
Summ. J. at 13, *CFTC v. Ackerman et al.*, 20 Cv. 1183 (NRB) (Jan. 7, 2021), ECF No. 43. Q3
returned approximately $5M to its customers. *Id.* at 14. Of the money Q3 took in, Mike
misappropriated approximately $9M for himself. PSR ¶ 28.[2]

Mike's conduct was inexcusable, and he is remorseful for it. He is not the type to make
excuses. But we would be remiss to fail to note that, during the offense, ██████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████

*Mike's medical condition.*[3] By September 2019 ██████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[2] Mike estimates that he personally profited somewhere between $7M and $9M—as the profits
were split between the partners—but he has agreed to forfeiture and restitution figures of over
$30M each, based on the total amount that Q3 took from its investors.

[3] The details in this section are taken from Mike's medical records, the PSR, and a report
prepared by Dr. Chibuzo U. Enemchukwu, MD, MS ("Enemchukwu Report") (Ex. H). Dr.
Enemchukwu is a physician board-certified in internal medicine and infectious diseases ████
████████████████████████████████████████████████

Honorable Laura Taylor Swain                February 1, 2022
United States District Judge                 Page 6 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)



Honorable Laura Taylor Swain                    February 1, 2022
United States District Judge                    Page 7 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)



In summary, Mike is deeply unwell.

**The law applicable to this sentencing**

As this Court knows, the Guidelines range is but one of many factors set forth in 18 U.S.C.
§ 3553(a) that a district court is to consider when imposing sentence. *See generally United States
v. Booker*, 543 U.S. 220 (2005). "The Guidelines are not only not mandatory on sentencing

Honorable Laura Taylor Swain                        February 1, 2022
United States District Judge                        Page 8 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892
(2009) (emphasis in original).

    As for the range in Mike's case, courts in our circuit have frequently criticized the
controlling Guideline, § 2B1.1, for its undue emphasis on loss amount. *See, e.g.*, *United States v.
Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ("As far as this court can tell, the
Sentencing Commission's loss-enhancement numbers do not result from any reasoned
determination of how the punishment can best fit the crime, nor any approximation of the moral
seriousness of the crime."). This undue emphasis has only grown over time, as each new iteration
of the loss enhancement has recommended a harsher sentence than the last, despite lacking any
empirical rationale for its ever-escalating numbers. *See* Hon. Jed S. Rakoff, *Why the Federal
Sentencing Guidelines Should be Scrapped*, 2013 WL 8171733 (criticizing the modern version of
§ 2B1.1 as unduly harsh where it yields a typical sentencing range "500 percent greater today
than it was under the original Guidelines"). The Second Circuit has observed that § 2B1.1's
myopic focus on loss is "unknown to other sentencing systems" and that this "unusualness is a
circumstance that a sentencing court is entitled to consider." *United States v. Algahaim*, 842 F.3d
796, 800 (2d Cir. 2016); *see also United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013)
(Underhill, J., concurring) ("[Because the fraud Guideline] was not developed by the Sentencing
Commission using an empirical approach based on data about past sentencing practices …,
district judges can and should exercise their discretion when deciding whether or not to follow
the sentencing advice that guideline provides.").

    Sentencing necessarily involves an analysis of a complicated mix of factors, not a blind
adherence to the Guidelines. The overarching command of § 3553(a) is that sentences be
"sufficient, but not greater than necessary," to achieve the basic goals of retribution, deterrence
and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the
nature and circumstances of the offense and the history and characteristics of the offender;
(2) the need for the sentence imposed to provide just punishment, deterrence, and needed
educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines range
and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid
unwarranted sentence disparities among similarly situated defendants; and (6) the need to
provide restitution. *See* § 3553(a). In every case, the sentencing court "must make an individual
assessment based on the facts presented." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

Honorable Laura Taylor Swain                           February 1, 2022
United States District Judge                            Page 9 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

**The Court should not sentence Mike to prison.**

  Not all criminal convictions should result in prison sentences. In fact, when Congress created the federal Sentencing Guidelines in the Sentencing Reform Act of 1984, it expressed the notion that first offenders who commit non-violent and otherwise less serious offenses should *not* receive prison sentences. *See* 28 U.S.C. 994(j). Mike—whose offense, though serious, was entirely non-violent—is one such first offender.

  A sentence that does not include imprisonment does not mean that Mike will escape punishment. He has already suffered meaningful collateral consequences for his wrongdoing. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). For one, he will forever carry the stigma of a felony conviction and, no matter what his health outcome, will never work in the financial field again. *See id.* (endorsing district court's view that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant").

  For another, he has agreed to robust restitution and forfeiture orders that require him to relinquish numerous assets, including the very home in which he and Stacey currently live. In his plea agreement and in a consent forfeiture order, he readily agreed to restitution and forfeiture of over $30M each, figures that represent all the proceeds traceable to Q3's malfeasance, notwithstanding that he misappropriated less than $10M for himself. He agreed specifically to forfeit multiple trading and bank accounts, cash, various pieces of real estate including his present home (and funds from sales of additional pieces of real estate), vehicles, and numerous pieces of jewelry. He also faces a number of parallel civil actions, including ones initiated by the CFTC and SEC, that are likely to conclude with monetary penalties and permanent bans from trading.

  These are all significant, if richly deserved, punishments. As a result of these financial consequences and the expense of his illness, Mike is destitute and in substantial debt. He and Stacey now subsist on his $1,400 monthly SSI payments, food stamps, and whatever assistance Mike's family is able to provide. Mike is on Medicare and Medicaid. He has fallen very far indeed.

  And there can be little doubt that two other important sentencing considerations— incapacitation and deterrence—have been achieved. First, Mike's dire physical condition means

Honorable Laura Taylor Swain                    February 1, 2022
United States District Judge                     Page 10 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

he is essentially incapable of committing another crime. More to the point, he has shown a level
of awareness about the motivations and consequences of his offense that is sometimes lacking
among defendants facing similar charges. He reiterated to the Probation Office what he told this
Court when he pled guilty: that his offense was motivated by greed. He added that he is "beyond
sorry" and has "learned [his] lesson." PSR ¶ 33. Stacey has seen his remorse up close: "He
wishes there was something he could do to make things right. This is something he will have to
live with the rest of his life and that torments him immensely." Letter of Stacey Ackerman (Ex.
F).

       At bottom, though, the gravity of Mike's medical condition and the care it requires eclipse
all other sentencing considerations. *See* § 3553(a)(2)(D) (directing sentencing courts to consider
a defendant's need for medical care). Dr. Enemchukwu writes that Mike's "medical problems are
numerous and complex and have left him in a tenuous state of debility and frailty." Enemchukwu
Report at 4. She details the exceptionally close care Mike needs on a daily basis, and the reality
that he is unlikely to receive such care if imprisoned.

       A description of a typical day in Mike's life brings home the reality of his medical
condition and the quantity and quality of care it requires.

Honorable Laura Taylor Swain
United States District Judge

February 1, 2022
Page 11 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)



Honorable Laura Taylor Swain                          February 1, 2022
United States District Judge                          Page 12 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)



Enemchukwu Report at 4 (citations omitted).

  This is all to say that Mike's path to survival is at best fraught with peril. His medical needs are simply too demanding to subject him to incarceration, even at whatever medical facilities the BOP might offer. Imprisoning Mike would take him away from the team of doctors, nurses, and other medical professionals whom he currently works with and who know his needs best.

Honorable Laura Taylor Swain                    February 1, 2022
United States District Judge                    Page 13 of 13

Re:   United States v. Michael Ackerman
      20 Cr. 93 (LTS)

███████████████████████████████████████████████

██████████████████████████████████████████ But he has
hope. He has hope as well that someday he can get better, and that he can work to further repay
the victims of his crime. He'll never forgive himself for what he's done. For now, though, he is
trying to get by one day at a time.

—

        Based on the extraordinary circumstances of Mike's case, we respectfully request that the
Court impose a non-incarceratory sentence.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

# EXHIBIT A

November 6, 2021

Dear Judge Swain,



Michael and I first met in 1992 on the floor of the New York Stock Exchange. Through business we became personal friends. I was married with two children; Michael was married with two children. Unfortunately, his second child was born with a coronary disorder that required several surgeries from infancy. He maintained superb professionalism in business while holding his family together. When the smoke began to clear, he immediately fundraised for the Children's Cardiac Wing at Columbia University Hospital in New York. He tirelessly did for several years. He also became a mentor for all new employees at UBS Warburg.

Anytime anyone he knew personally or professionally had any difficulties – financial, medical or whatever – Michael was the first to personally assist or assemble a group to help the person in need. Michael took me into his home when my life started to fall apart. He had me stay with him on several occasions rather than let me be alone in a hotel room. I had lost my job in 2010 and my life was spiraling out of control. In 2011 my girlfriend called Michael in desperation. He immediately got a group together to get me into rehab. Thanks to him, I have been sober since 7-7-11. This is the Michael Ackerman I have known and loved.



Yours truly,



# EXHIBIT B

November 15, 2021

Judge Swain,

My name is Joseph Ackerman. I am Michael Ackerman's oldest brother. I write this letter of support to help Your Honor better decide Michael's fate in the legal system.

Like many older siblings, I left home and didn't much look back. Much of what I know of my brother's twenties, when he went from a typical kid in a small rust belt town to a stockbroker in New York, is filtered through my mother's stories. She would watch the news, waiting for a segment that briefly showed the floor of the stock exchange, in hopes she could catch a glimpse of Michael. She regaled me with stories of what was, by her standards, Michael's impossibly expensive house. There were funny stories, like the time Mike's now-former wife threw a bunch of new, functional clothing out, and my mother (herself from Flushing, Queens) was out front of the house picking through the garbage, indignant at the wastefulness, and Mike's wife in turn was indignant that she was "out there going through the trash!"

Reading between the lines of these stories, and seeing his family at Christmas and funerals, it seemed to me that Mike was driven through life not by a desire for money and status but by a desire to provide these things for his family. I think this is important, Mike is more of a people pleaser than most people I've known. When we were kids and our parents fought, Mike was the conciliatory one, the one who wanted problems to go away and for everyone to just get along. When Mike had something, he shared, generous to a fault. He has always been, from childhood to old age, someone motivated to help the people around him.

When everything went to crap in 2007-2008, Mike went from riches to rags. Transparent, upfront guy that he is, he was amazed and angry when people he worked with in the stock market screwed him out of money, because he would never have done the same to them. He went from working on the floor of the stock market to working as a security guard. I remember he asked my mother for money to buy his kids Christmas presents that year, which I know he found humiliating. He went through a very difficult divorce that shook his identity as a "success" who provided for his wife and kids. What followed was a hard decade for Mike. I believe the decisions he made proceeded from this.

So, I look at Michael now, and I'm frankly in awe that he keeps going. I've had my share of major health problems, and I'm not sure, honestly, that in his place I wouldn't put a bullet in my mouth. His body has become a nightmare I wouldn't wish on anyone, and given what I know of healthcare in the prison system, ending up there seems like a death sentence for Michael. I talk with Mike regularly now, and his existence is filled with ███████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

I strongly believe punishing him even more will not serve the interests of justice. It will just add more sadness to an already sad situation. Please, Judge Swain, let my brother stay out so he can live what life he has left.

Sincerely,

Joseph Ackerman
███████████████████

# EXHIBIT C



# EXHIBIT D

Log out

Mike

- [Change Your Photo](#)
  Choose File   No file chosen

- [Change Your Shortcuts](#)



# EXHIBIT E



# EXHIBIT F

November 4, 2021

Dear Judge Swain:

My name is Stacey Ackerman. I'm Michael's wife. I've been with Mike for 3 years and we've been married a little over 2 years. I fell very quickly in love with Mike because I found him to be attentive, caring, supportive and honest. He treats me very well and we have a wonderful, loving marriage.

Mike has three kids from his previous marriage that live in New York. Mike loves his kids very much and misses them terribly. He calls or texts with each of them daily. He also has two elderly parents that live two hours from us. He also calls them daily and we see them often. He always looks out for them. Mike has a few guys that he's been friends with for years. If any of them ever need anything, Mike is the first person they call. If he has $10 to his name, he'll give them $9. He truly has a soft spot for the ones he loves. He's has also flown a few of my friends out or sent us on a girls' vacation, all expenses paid. He loves to make other people happy and always puts others before himself.



I know Mike has so many regrets about the lapse in judgement and poor decisions he made. He did a bad thing and he knows it. He's especially remorseful about the people he hurt who he had considered good friends. He talks about it frequently and only wishes he could go back and do things differently. He wishes there was something he could do to make things right. This is something he will have to live with the rest of his life and that torments him immensely.



I love my husband more than anything. I was very distraught when I learned of the crime Mike committed. Like I said he truly is a great man that made an awful decision. My only hope right now is that he survives. I don't know what I would do without him. I credit him for saving my life. I would do anything for him and I know he would do anything for me.

Thank you for your time,

Stacey Ackerman

# EXHIBIT G



October 28, 2021

Re: Michael W Ackerman



To whom it may concern,

This letter was initially viewed by Michael W Ackerman at 10/29/2021 10:05 AM.

# EXHIBIT H

# CHIBUZO U ENEMCHUKWU, MD, MS

423 East 78th St, #4E
New York, NY 10075
Phone: 917-719-1173
Fax: 646-921-4222

January 30, 2022

Honorable Laura Taylor Swain
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *United States v. Michael Ackerman*, 20 Cr. 93 (LTS)

Dear Judge Swain:

I was retained as a medical expert by Mr. Michael Ackerman's attorney, Jonathan Marvinny, for the matter concerning *United States v. Michael Ackerman*.









Please do not hesitate to contact me if you have any further questions.

Sincerely,

Chibuzo U Enemchukwu, MD, MS

1. 

